UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-00086-TBR

JAMI W. STEEG,                                                        Plaintiff

v.

THOMAS J. VILSACK, *et al*.                                         Defendants

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendants' motion for summary judgment. (DN 22).  Plaintiff has responded.  (DN 23).  Defendants have replied.  (DN 29).  For the following reasons, Defendants' motion for summary judgment is DENIED.

BACKGROUND

This matter arises out of the employment of Jami W. Steeg with the United Stated Department of Agriculture ("USDA").  Steeg claims that she subjected to a hostile work environment, quid pro quo sexual harassment, and was retaliated against in violation of state and federal law.  As Steeg is the party opposing summary judgment, the Court shall interpret the facts in the "light most favorable" to her.  *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011).

In March, 2011, Steeg was hired by the USDA as a Food Inspector.  Steeg was responsible for examining animal carcasses, specifically chickens, at the Pilgrim's Pride facility in Hickory, Kentucky.  Upon being hired, Steeg traveled to the USDA's district office in Raleigh, North Carolina, for training.  Although Steeg was informed that she would receive two weeks of training, she received only a three-day orientation, a day-

and-a-half training with a supervisor on the line, and three days observing other employees. (DN 22-2, p. 23-26).

After completing training Steeg began working on the night shift. Steeg felt her supervisor, Bill Burgess, was "overly friendly to her from the beginning," "frequently stood close to her," and called her off the line to his office "where he would talk to her about his life, ask questions about her life, and discuss other random matters." (DN 1).

Steeg worked in a large room with long conveyor belts from which chickens were hung, having just been transferred from the slaughter room. The chickens would go through a scalder and a machine that would remove the viscera. (DN 22-5, p. 101). Steeg was responsible for inspecting the chickens as they traveled along the line. USDA inspectors were stationed approximately twenty-five feet apart. They were responsible for inspecting the chickens while trimmers, who were not USDA employees, worked on them. Unless the line was down it moved quickly and required all employees to be at their stations. Chickens would pass in front of an inspector "every 1 1/2 seconds, so you're just constantly looking at the inside and outside of the chickens to see -- just really looking for abnormalities." (DN 23-2, p. 2). Steeg described the room as "very loud, very bright" and "very wet." (DN 22-5, p. 102).

A contract employee for the USDA named Derrick Noffsinger occasionally filled in on the line and was stationed near Steeg. Steeg informed Burgess that Derrick Noffsinger made her uncomfortable. "[H]e would just sit there and just stare at me and be making hand gestures and all this stuff." (DN 22-5, p. 45). When Steeg went to lunch, he would sit next to her and ask whether she had a boyfriend.

In May, 2011, Steeg became seriously ill, causing her to lose weight and miss approximately five weeks of work.  When Steeg returned to work Burgess said that Steeg must have morning sickness because Derrick Noffsinger "knocked you up."  (DN 22-5). Burgess also made comments about Steeg's loose-fitting clothes and told her "The jeans look really good on you.  I would like to see them on the floor."     (DN 22-5, p. 52). Steeg claims that Burgess made comments about other females employees, such as describing a trimmer named Valencia by saying "her juices would be so sweet like a Valencia orange that he would like to taste them." (DN 22-5, p. 54).  Burgess also asked Valencia out to the casino.  (DN 22-5, p. 54).  Steeg also claims that Burgess was known to have had affairs with several trimmers and had a child with an employee at the Pilgrim's Pride facility.  (DN 22-5, p. 66).  Other employees confirmed that Burgess had relationships with other female employees.  (DN 23-2, p. 4; DN 23-6, p. 5).  Steeg alleges that Burgess would try to invite himself to her house under false pretenses, such as expressing interest in buying a sheep, even though she did not raise sheep.  (DN 22-5, p. 54).

Steeg claims that Burgess would inappropriately touch her.  Burgess would join Steeg on her stand and "he would always reach around me and made sure he tried to feel me up as he was going for the birds."  (DN 22-5, p. 58).  There were also "numerous times that he'd come around me like escorting me off the stand, but it would always be as he was feeling me up escorting me off."  (DN 22-5, p. 58).  When Steeg would place her hands on each carcass to inspect it, "he would take his hand and lay it over top of mine or whatever and just -- it was sickening."  (DN 22-5, p. 58-59).  "I mean, he had no reason to touch me, period."  (DN 22-5, p. 59).

Burgess also frequently called Steeg into his office.  Each time Steeg was taken off the line another employee was required to fill Steeg's place on the line.  (DN 22-2, p. 37).  Wayne Richards or Nathan Kohl, lower level supervisors, were frequently required to fill in for Steeg.  Richards testified that he had never seen a probationary employee taken off the line that frequently.  (DN 23-5, p. 5).  Richards raised his concern with Dr. Mark Harpole, the Supervisory Public Health Veterinarian, who said that Steeg was not listening to instructions.  (DN 23-5, p. 5).  Richards and Kohl both raised their concern with Shannon Noffsinger,[1] the union president. One night, Burgess instructed Richards and Kohl to replace Steeg on the line.  Kohl made a comment in response to this request (DN 23-6, p. 3), questioning why they needed to do so.  (DN 23-5, p. 6).  Burgess replied:  "if you were trying to get into her pants, you would be getting her off the line, too."  (DN 23-5, p. 6).[2]

Steeg reported Burgess's behavior to Barry Scoggins, her union representative. He allegedly warned her "you don't want to rock the boat because you're in your first year" and gave her a number she could call.  (DN 22-5, p. 55).  Steeg also confided in Lori Johnston, a female food inspector for the USDA.  Johnston testified that she became concerned after this call.  She also stated that while "those stands are tight," they are "not so tight where you should be touching each other if somebody were to get up there and stand beside you."  (DN 23-2, p. 5).  Steeg filed an EEOC complaint in January, 2012, but withdrew it in February.  (DN 22-5, p. 26).  Steeg also reported Burgess's conduct to

---

[1] Shannon's cousin was Derrick Noffsinger.

[2] After an investigation, Burgess received a Letter of Caution for this incident.  (DN 22-1).

Shannon Noffsinger, who told her that "if you upset one of Dr. Kelso's[3] babies," then "your head's going to be on the chopping block."  (DN 22-5, p. 59).

A week after making her report to Noffsinger, Burgess would no longer meet in private with Steeg.  Burgess also began reprimanding her for various offenses.  On one instance, Burgess gave Steeg permission to bring a carcass to Dr. Pickens, a veterinarian at the facility, during her break.  Burgess then gave Steeg a written reprimand for being tardy after break, even though Burgess was aware Steeg would be late.  When Steeg questioned him, Burgess told her "I run this show.  I can do whatever I want to."  (DN 22-5, p. 17).  Employees carried stopwatches when they went on break.  Employees were supposed to start the stopwatch at the same time as their supervisor.  Burgess gave Steeg breaks while his stopwatch was already running.  He claimed he was tracking the extra time, but then cited her when she returned late by his watch.  (DN 22-5, p. 77).  Steeg also claims she was cited for being tardy on several instances for minor issues outside her control, such as guard gate being down or a garbage truck blocking the entryway.  (DN 22-5, p. 78).

Steeg also claims that Burgess was friends with Kim Getz, a plant employee.  The two would harass[4] Steeg, on occasion standing behind her and talking about her.  (DN 22-5, p. 60).  Steeg entered Burgess's office while Getz was present and Getz stated:  "Oh, there's the bitch."  (DN 22-5, p. 61).  Getz called Steeg a "Keebler Elf looking bitch" and "would throw guts all over my seat and all over my work area and soak my area down

---

[3] Dr. Janey Kelso was the supervisory veterinarian in charge of the plant.  (DN 22).

[4] Barry Scoggins, another inspector, also testified that he had had problems with Burgess and that Burgess was a bully.  (DN 22-7, p. 14).

whenever we went on break." (DN 22-5, 48). Eventually, Shannon Noffsinger was required to intervene.

Steeg also felt threatened when a meat trimmer "was slinging his knife around." (DN 22-5, p. 48). Steeg reported the trimmer to Burgess, who told her that trimmer "was like some guy on Sling Blade." (DN 22-5, p. 48). The trimmer was moved to a new line. (DN 22-5, p. 49).[5]

Steeg also had an incident with Angela Noffsinger, the wife of Shannon Noffsinger. Steeg patted her on the shoulder and told her to have a good weekend. (DN 22-5, p. 28). Angela Noffsinger claimed that Steeg inappropriately touched her. After this incident, multiple employees suggested that Steeg was a lesbian. (DN 22-5, p. 38). Steeg was transferred to a facility in Beaver Dam for several weeks before returning to Hickory. (DN 22-5, p. 30). An employee testified that Angela Noffsinger was rumored to be unhappy with Steeg for talking to her husband Shannon. (DN 23-2, p. 3).

On a separate incident, an employee believed Steeg had possibly made threats towards him. Steeg walked outside where Garfield Hayden and Peggy Mangrum were talking. Steeg commented that "'Everybody need to watch their back,' or something to that state." (DN 22-5, p. 36). Hayden initially felt this was a threat directed at him and that he may lose his job. (DN 22-3, p. 249). Hayden later stated it was a misunderstanding and did not wish to pursue the complaint. (DN 22-3, p. 187).

Steeg received one performance evaluation. This evaluation graded Steeg for her performance from her hire date of March 27, 2011 until September 30, 2011. Steeg was

---

[5] This meat trimmer was transferred and eventually terminated. (DN 22-1). His connection, if any, to Burgess is tenuous, but the incident does establish the milieu at facility.

rated "Fully Successful." (DN 22-2, p. 61). The bottom of the performance evaluation contained several acknowledgments as to USDA policies. Steeg said she would sign her evaluation but "not going to checkmark all of [the boxes], because that's me agreeing with what has taken place, and I don't agree with it." (DN 22-2, p. 46).

The USDA sent Steeg a termination letter dated March 7, 2012. Steeg's probationary period was scheduled to end on March 26, 2012. (DN 23-3). Steeg did not receive her termination letter until March 15, 2012. Steeg continued to work in the interim. On March 8, Steeg was working on a stand when a "shackle shattered" and hit Steeg in the eye. Steeg claims the USDA tried to deny paying her medical bills. (DN 22-5, p. 30).

In her termination letter, the USDA cited several reasons for releasing Steeg, including delay in completing an employment form, tardiness arriving to work and after breaks (ranging from one to seven minutes late), and the incidents with Angela Noffsinger and Garfield Hayden. (DN 23-3). Steeg argues these reasons were baseless and many of them fabricated by Burgess. (DN 23). Steeg claims she was terminated in retaliation for reporting Burgess's behavior. Steeg also claims she was subjected to a hostile work environment and quid pro quo sexual harassment. Defendants now move for summary judgment on all claims.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[N]ot every issue of fact or conflicting inference presents a genuine issue

of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of her position; she must present evidence on which the trier of fact could reasonably find for her. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).

A plaintiff may establish a discrimination claim by either direct or circumstantial evidence. *See Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). "Direct evidence is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action.'" *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 465 (6th Cir. 2014) (*quoting Geiger*, 579 F.3d at 620). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 330 (6th Cir. 2012) (*quoting Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (*en banc*)) (internal quotation marks omitted).

Absent direct evidence of discrimination, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *Monette*, 90 F.3d at 1186. The plaintiff must first make a prima facie case of discrimination. *Id*. This requires a plaintiff to show: (1) he is a member of a protected class; (2) he was otherwise qualified for the position; (3) he suffered an adverse employment action; and (4) the circumstances under which he suffered that action give rise to the inference of unlawful discrimination. *Id*. Once a prima facie case is established, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. *Id*. If the defendant offers sufficient evidence of a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to identify evidence from which a reasonable jury could conclude that the proffered reason is actually pretext for unlawful discrimination." *Id*.

## DISCUSSION

Steeg has asserted claims of (1) hostile work environment; (2) quid pro quo sexual harassment; and (3) retaliation under both Kentucky and federal law.[6] (DN 1). "The same standards of interpretation apply to Kentucky's Civil Rights Act, Ky.Rev.Stat. § 344.040(1), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq." *Conner v. State Farm Mut. Auto. Ins. Co.*, 273 F. App'x 438, 445 (6th Cir. 2008); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000); *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008). Accordingly, the Court will concurrently analyze both sets of claims.

---

[6] Steeg also asserted two claims of defamation but the parties now agree that the USDA is entitled to sovereign immunity on these claims. (DN 22, 25).

## I.   Hostile Work Environment.

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

"Case law recognizes two types of sexual harassment: 1) harassment that creates an offensive or hostile environment; and 2) quid quo pro harassment, in which a supervisor demands sexual favors as a condition for job benefits." *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 182 (6th Cir. 1992). "[T]he label affixed to the claim is not dispositive; instead, the focus should be on the substance of the plaintiff's allegations." *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 629 (6th Cir. 2013) ("no 'magic words' are necessary to state a claim and we should instead examine the substance of a plaintiff's allegations"). Steeg has asserted both hostile work environment and quid pro quo harassment. The Court will analyze the latter in the next section.

A hostile work environment claim arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "But conduct that is not severe or pervasive enough to create an objectively hostile or

10

abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 717 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Harris*, 510 U.S. at 21). "Whether misconduct rises to the level of a hostile work environment is a legal question that may be decided on a summary judgment motion." *Stacy v. Shoney's, Inc.*, 142 F.3d 436 (6th Cir. 1998).

"A successful hostile-work-environment claim under Title VII requires a plaintiff to establish that: (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [sex], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013).

In this case, the parties dispute whether the alleged sexual harassment suffered by Steeg is severe and pervasive enough to give rise to a hostile work environment claim. "The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a mathematically precise test." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (citation omitted). Whether an environment is hostile or abusive can be determined only by looking at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "Title VII was not meant to create a 'general civility code,' and the 'sporadic use of abusive language, gender-related jokes, and occasional teasing' are

11

not sufficient to establish liability." *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 352 (6th Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The conduct must be both objectively and subjectively hostile, such that a reasonable person would find it abusive and the plaintiff subjectively regards it as such. *Stanley v. Cent. Ky. Cmty. Action Council, Inc.*, 2013 WL 3280264, at *4 (W.D. Ky. June 27, 2013).

Defendant argues that although "Burgess' alleged comments and actions, if taken as true," were in "poor taste," they do not rise above being merely offensive. (DN 29). Defendants cite to a bevy of Sixth Circuit cases. The Court finds these cases are helpful in explaining what constitutes a hostile work environment but are also distinguishable from the facts in this case. For instance, in *Zaring* a female employee working for a property developer sat through a series of bi-weekly meetings in which the male employees made sexually suggestive comments and proposed innuendo-laden names for a tract of land next to a Hooters restaurant. *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 824 (6th Cir. 1997). Plaintiff filed an EEOC claim. The case proceeded to trial and a jury awarded her $250,000 in damages. *Id.* at 825. The Sixth Circuit reversed. It found that the conduct was "merely offensive" because although the comments were sex-based, they were not directed at the plaintiff, and the other circumstances were insufficient to create hostile work environment. *Id.* at 826. Similarly, in *Richards*, the Sixth Circuit found that comments describing plaintiff as "my girl attorney" and "little legal gal" and describing a bell curve "as resembling 'a pair of woman's tits'" were "clearly improper and have no place in a professional work setting," but were also nothing more than "isolated examples of boorish behavior" which did not create a hostile work environment. *Richards v. Dep't of Army*, No. 05-1091, 2007 WL 579549, at *5 (6th Cir. Feb. 15, 2007).

Defendants argue the facts of *Stacy v. Shoney's, Inc.*, 142 F.3d 436 (6th Cir. 1998) "closely mirror[s]" the allegations in this case. (DN 29). In *Stacy*, the plaintiff claimed her supervisor said "Your tan sure does look good I wish I could see more of it"; "I like it better when you wear your hair down"; "[I]f [I] had someone that looked like you, I'd not let them leave the house"' and "I'd move in with you and take care of you." *Id*. at 436. Furthermore, on one occasion her supervisor "inappropriately touched her breast when he removed and replaced an ink pen from her front shirt pocket." *Id*. at 436. The *Stacy* case is closer to the facts of this case in that it involved physical harassment. *Hawkins*, 517 F.3d at 334 ("harassment involving an 'element of physical invasion' is more severe than harassing comments alone.") (citation omitted). However, that case involved only one incident of physical touching, significantly fewer instances of vulgar comments, and lacked evidence of any other employee corroborating plaintiff's complaints of sexual harassment.

The Court finds that, viewing the totality of the circumstances in this case, Steeg has presented sufficient evidence of a hostile work environment to survive summary judgment. Steeg alleges that Burgess made sexually suggestive comments over several months. Burgess not only ignored Steeg's complaints that another employee was harassing her, but instead commented that Steeg has been impregnated by her harasser. On several occasions Burgess groped Steeg or touched her in a discomfiting manner. Burgess detained Steeg in his office for extended periods of time, taking her away from her job. When questioned about this by other employees, Burgess stated that he was trying to sleep with Steeg. When Burgess learned that Steeg had complained about his behavior, he began to treat her differently than other employees. Burgess also tacitly

approved another worker's verbal harassment of Steeg, which ultimately escalated into Steeg's workplace being soaked and covered in chicken viscera.  Collectively, these actions are sufficient to show that Steeg was subjected to an abusive working environment.  *See e.g. Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999) (holding repeated sexual innuendo, a co-worker saying "Hey, slut," and pranks "including finding office supplies glued to one's desk, being hit by a thrown box, and being locked in one's work area" were sufficient to survive summary judgment); *Hawkins*, 517 F.3d at 334;  *Abeita v. TransAmerica Mailings*, 159 F.3d 246 (6th Cir. 1998);  *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 19, 114 S. Ct. 367, 369, 126 L. Ed. 2d 295 (1993) (reversing and remanding summary judgment in favor of forklift company's president who repeatedly made sexual innuendos, asked female employees to retrieve change from his front pocket, and threw items on the ground for female employees to pick up).  Accordingly, Defendant's motion for summary judgment on Steeg's hostile work environment claim will be denied.

## II.     Quid Pro Quo Sexual Harassment.

"Under the Guidelines established by the Equal Employment Opportunity Commission ("EEOC"), *quid pro quo* harassment occurs when 'submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual.'"  *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994) (*quoting* 29 C.F.R. § 1604.11(a)(2) (1993)).

"To prevail on a *quid pro quo* claim of sexual harassment, a plaintiff must assert and prove (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4)

14

that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability." *Highlander v. K.F.C. Nat. Mgmt. Co.*, 805 F.2d 644, 648 (6th Cir. 1986). "Under the theory of respondeat superior, employers are held strictly liable for conduct of supervisory personnel who have plenary authority to hire, fire, promote, and discipline employees." *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 186 (6th Cir. 1992).

Steeg, a female, is a member of a protected class.  Defendant concedes for the sake of argument that Steeg was subjected to unwelcome sexual harassment and that Burgess's actions would give rise to respondeat superior liability.  (DN 22).  The only issue the parties dispute is whether Steeg suffered a tangible job detriment.

"The terms 'tangible job detriment' and 'materially adverse employment action' are used interchangeably by the courts." *McFarland v. Henderson*, 312 F. Supp. 2d 918, 922 (N.D. Ohio 2004) (*citing Bowman*, 220 F.3d at 462 n. 5). "A tangible job detriment is a 'discharge, demotion or undesirable reassignment.'" *Hollar v. RJ Coffey Cup, LLC*, 505 F. Supp. 2d 439, 452 (N.D. Ohio 2007) (*quoting Faragher*, 524 U.S. at 808); *Iceberg v. Whole Foods Mkt. Grp., Inc.*, 914 F. Supp. 2d 870, 880 (E.D. Mich. 2012) ("a pay increase, a promotion, or a 'significant' new responsibility"). Conversely, the failure to receive "petty job benefits" is insufficient to establish a tangible job detriment. *Id.* ("a preferred shift and a couple of tardy-for-work passes fails to satisfy the law's definition of 'tangible.'"); *McCormick v. Kmart Distribution Ctr.*, 163 F. Supp. 2d 807, 829 (N.D. Ohio 2001) ("the denial of secondary job assignments simply does not establish a

15

tangible job detriment").  However, it is not enough that the employee suffered a tangible job detriment.   There must be a "connection between the plaintiff's reaction to unwelcome advances and job-related consequences of that reaction."  *Davis v. McNea*, 108 F.3d 1376 (6th Cir. 1997) (unpublished); *Johnson v. Miles*, 2011 WL 3880507, at *5 (E.D. Ky. Sept. 2, 2011).   In comparison, the "hostile work environment analysis does not require one to show a tangible job detriment resulting from her refusal to perform sexual favors."  *Sconce v. Tandy Corp.*, 9 F. Supp. 2d 773, 776 (W.D. Ky. 1998).

There is no question that Steeg's termination is sufficiently severe enough to qualify as a tangible job detriment.  *Hollar*, 505 F. Supp. 2d at 452.  However, Defendant argues that Steeg has failed to show a connection between her termination and Burgess's acts.  Viewing the facts in the light most favorable to Steeg, the Court finds Steeg has established this connection.  Steeg has demonstrated that she was sexually harassed by Burgess, both by her testimony and independent testimony of other supervisors.  (DN 23-6, p. 3; DN 23-5, p. 6).  Steeg has also shown that Burgess threatened her job and that Steeg feared retaliation if she reported Burgess's acts.  (DN 22-3, p. 9; DN 23-2, p. 4; DN 23-3, p. 9).  Defendant argues Steeg was actually terminated for the "eleven instances of misconduct" outlined in the termination notice.  (DN 22-1).  Furthermore, the Deciding Official for Steeg's termination, Victoria Rosas, was allegedly unaware of these incidents at the time she decided to terminate Steeg from her probationary role.  (DN 22-3, p. 6). While these allegations may be true, at this stage the Court cannot accept Defendants' explanation in place of a plausible explanation put forth by Steeg.   Defendant argues this case is similar to *Prechtel*, in which the Sixth Circuit found a lack of connection warranted summary judgment for the defendant.  *Prechtel v. Kellogg's*, 270 F. App'x 379

(6th Cir. 2008).  This Court finds *Prechtel* to be distinguishable because the evidence of harassment and facts linking that harassment to the tangible job detriment were significantly less, so much so that the Sixth Circuit commented that there was "so little in the record to substantiate it."  *Id.* at 381.  (finding "three inappropriate comments" made "seven or eight months prior" and an attempt to grab plaintiff's leg "three months prior to the meeting at which the plaintiff was given the three options for her future with the company" were insufficient to serve as the "impetus for any adverse employment action." Accordingly, Defendant's motion for summary judgment on Steeg's quid pro quo claim will be denied.

### III.    Retaliation.

"To establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in protected activity; (2) that he suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action." *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997).  An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

If the plaintiff establishes a prima facie case, the employer must then offer a legitimate, nondiscriminatory reason for its action.  *See Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996).  If the employer satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual.  *Id*; *Penny*, 128 F.3d at 417 ("The plaintiff, of course, bears the

ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination").

Defendant first argues Steeg has not established a prima facie case of retaliation because she did not engage in a protected activity.[7]  An employee engages in protected activity when they (1) file, assist, or participate in the investigation of a complaint; or (2) oppose any practice which violates Title VII.  *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989).  "'Oppose' goes beyond 'active, consistent' behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it." *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 277 (2009).

Defendants argue Steeg did not file a formal EEOC complaint until after she was terminated.[8]  Therefore, any protected activity by Steeg must arise from her opposition to any practice which violates Title VII.  Defendants, citing *Booker*, argue Steeg did not engage in a protected activity because she made only a "vague" claim of harassment. (DN 29).  The Court finds *Booker* to be distinguishable from this case.  The *Booker* court held that a plaintiff's internal letter that "the charges against him are a result of 'ethnocism'" was, without more, insufficiently vague.  *Booker*, 879 F.2d at 1313.  In comparison, in this case Steeg reported her sexual harassment on multiple occasions to several authorities.  *See generally Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 647 (6th Cir. 2015).  Demanding that a supervisor cease harassing conduct and

---

[7] The parties do not dispute that Steeg suffered an adverse employment action in being terminated or that there was a causal connection.

[8] Steeg filed an EEOC complaint in January, 2012, but retracted that complaint.

reporting that harassing conduct to other authorities which can prevent future harassment are protected activities. *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015); *Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 750 (6th Cir. 1986); *Reed v. Cracker Barrel Old Country Store, Inc*., 133 F. Supp. 2d 1055, 1070 (M.D. Tenn. 2000) ("she complained to both Ms. O'Rourke and Ms. Golliher and wrote a letter to the home office complaining of Mr. Hooper's conduct [and] . . . told Mr. Hooper directly that he must stop sexually harassing her."). Accordingly, Steeg has established a prima facie case of retaliation.

The burden therefore shifts to the Defendant to offer a legitimate, nondiscriminatory reason for its action. *Monette*, 90 F.3d at 1186. The Supreme Court has specifically rejected a requirement that employers "prove absence of discriminatory motive" and affirmed that employers need only "articulate some legitimate, nondiscriminatory reason for the employee's rejection." (emphasis in original) *Bd. of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 (1978) (citation omitted). "This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009). In her termination letter, Defendants cited Steeg's alleged failure to timely complete an employment form, disagreements with co-workers, several instances of being tardy, and incidents with Angela Noffsinger, Kim Getz, and Garfield Hayden as grounds for dismissal. (DN 22-3, p. 247-50). These stated grounds for termination satisfy Defendant's requirement to offer a legitimate, nondiscriminatory reason for terminating Steeg.

Once a defendant has met their burden, "the presumption raised by the *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981). "A plaintiff may demonstrate that an employer's proffered legitimate reason for an adverse employment action is pretextual on any of three grounds: 1) by showing that the reason has no basis in fact; 2) by showing that the reason did not actually motivate the employer's action; or 3) by showing that the reason was insufficient to motivate the action." *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir. 2007) *abrogated by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012). To "survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 533 (6th Cir. 2007).

As noted above, Defendant claims Steeg was actually terminated for the "eleven instances of misconduct" outlined in the termination notice. (DN 22-1). In response, Steeg argues that she competently performed her job, as evidenced by the "Fully Successful" rating she received on her performance evaluation. (DN 22-2, p. 61). Steeg disputes the factual basis behind the claims she was tardy on four occasions and spread gossip that Burgess wanted her fired. Steeg also argues that it was improper for the USDA to hold her "disagreement with plant employee, Kim Getz," which was sparked by Getz covering Steeg's work station in viscera and soaking it, against Steeg. Similarly, Steeg argues it was improper that her "disagreement with a plaint employee named Dee," who allegedly called Steeg "the blond bitch," against Steeg. Finally, Steeg disputes the factual basis for the remaining instances: failure to timely complete a form when she

began work, unprofessionalism in requesting red meat training, and incidents with Angie Noffsinger and Garfield Hayden.   Steeg also argues that, regardless of the above incidents, Defendant's true motive in terminating Steeg was retaliation for resisting Burgess's sexual advances and reporting his conduct.   As noted above, in light of the significant evidence that Steeg was sexually harassed and reported this harassment, the Court finds that a reasonable jury could believe that Steeg was actually terminated for reporting her harassment.   *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009) ("At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial."); *see also Griffin v. Finkbeiner*, 689 F.3d 584, 594 (6th Cir. 2012).   Therefore, notwithstanding the fact that Defendant has raised plausible grounds upon which Steeg's termination could have been based, the Court must deny summary judgment on this claim.

CONCLUSION

IT IS HEREBY ORDERED Defendants' motion for summary judgment (DN 22) is DENIED.

cc:     counsel of record